TEXAS CO. et al. v. INGRAM.

Middle Section.   March 11, 1933.

Petition for Certiorari denied by Supreme Court, May 20, 1933.

268

Roberts & Roberts and William Green, all of Nashville, for plaintiffs in error.

Walter S. Faulkner, of Lebanon, and C. L. Cummings, of Murfreesboro, for defendant in error.

FAW, P. J.   The three plaintiffs in error, viz., the Texas Company, James L. Roberts, and W. L. Foutch (hereinafter called defendants), have appealed in error to this court from a judgment of the circuit court of Rutherford county for $5,000 and costs against them and in favor of the defendant in error, Mrs. Kate Jones Ingram (hereinafter called plaintiff).

The judgment thus brought up for review was rendered upon the verdict of a jury in an action brought on January 1, 1931, by the plaintiff, Mrs. Ingram, to recover damages for personal injuries suffered by her on January 24, 1930, in a collision between two automobiles, one of which was driven by the plaintiff and the other by defendant W. L. Foutch.

The fact that there was a collision between two cars driven by the

plaintiff and the defendant Foutch, respectively, at the time and place stated in the plaintiff's declaration, and that the plaintiff was injured as a result of the collision, is not now denied by the defendants; but the character and extent of plaintiff's injuries and the liability of the defendants therefor are matters of serious controversy.

The collision occurred on a highway bridge which spanned Stone's river near the village of Walter Hill on the highway connecting the towns of Murfreesboro and Lebanon. Plaintiff lived in Wilson county, and was on her way to Murfreesboro in Rutherford county, where her mother resided. She was driving an "old model" Ford car, and was accompanied by her infant son, Wade Hill Ingram, about four years of age. Defendant Foutch was driving a Chevrolet roadster, which had a small "slip-on" truck body attached, and was traveling from Murfreesboro towards Lebanon. He was alone, and the truck he was driving was not loaded.

The bridge is described in the record as a "one-way bridge," as it was too narrow to permit the passage of more than one automobile at the same time, and the ends of the bridge are distinguished by referring to one as the Murfreesboro end and to the other as the Lebanon end, meaning, of course, the ends nearest Murfreesboro and Lebanon, respectively.

The bridge was 300 feet long, and the two cars collided at a point forty-six feet from the Murfreesboro end of the bridge.

As defendant Foutch followed the highway approaching the bridge, he descended a hill for a distance of probably 100 yards, with the bridge and any automobiles thereon within the range of his vision, and then, after traversing a sag below the level of the bridge for a short distance, turned to his left, almost at an angle of ninety degrees, onto the bridge.

According to the testimony of defendant Foutch, the plaintiff, Mrs. Ingram, with ample time and opportunity to stop her car, drove it against the car of defendant Foutch after the latter had stopped, and the plaintiff's own negligence was the proximate cause of her injuries; but we need not dwell on the testimony of defendant Foutch with respect to the manner in which the collision occurred, for he is contradicted by the testimony of Mrs. Ingram and her witness Morgan Green, and, as the verdict implies that the jury accepted the testimony most favorable to the plaintiff, we must, under well-settled rules, likewise accept it as the truth of the case, and discard all countervailing evidence.

With reference to the circumstances immediately attending the collision, the plaintiff, Mrs. Ingram, testified as follows:

"Q. Now describe to the Court and jury what happened? A. Well, the truck just ran in on the bridge, and I was there with my

car, and it ran against my car and threw me against the steering wheel.

"Q. Is that a double passage bridge, or a single passage bridge? A. It is single.

"Q. Do you know how long that has been a single passage bridge? A. I don't know, sir.

"Q. Well, about how long, ten or twelve years? A. Yes, sir, ever since I have been coming along there.

"Q. How long have you been coming along there? A. Oh, ten or twelve years.

"Q. Has it been anything but a single passage bridge? A. No, sir.

"Q. When you saw him coming what did you do; did you do anything to stop your car? A. Yes, sir, I did everything I could to stop my car.

"Q. With what violence or force did he strike, did he run into you? A. I don't understand you.

"Q. With what violence did he run into you? A. It ran into me fast and hard.

"Q. Well, what was the result? A. Well, it threw me against the steering wheel and tore my car up, and threw my baby through the windshield.

"Q. Did it break the windshield? A. Yes, sir.

"Q. What part of his body went through the windshield, Mrs. Ingram? A. His head.

"Q. You mean the glass of the Ford car? A. Do I mean the glass?

"Q. Yes? A. Yes, I mean the windshield, the glass.

"Q. Well, go ahead, I want to get all the facts so the jury will know them, you know. How badly did it break the glass in the windshield? A. It broke all, except some pieces in the car, as I remember it.

"Q. Where was the baby sitting at the time of the impact? A. At my side.

"Q. At your side? A. Yes, sir.

"Q. Was it a double seated or a one seated Ford car? A. My car?

"Q. Yes. A. It was a '26 Ford Touring car.

"Q. And you were under the steering wheel? A. Yes, sir.

"Q. And he was by your side? A. Yes, sir.

"Q. I see, you told the Court it tore up your car; tell how it injured your car, if you will, please; where did it hit your car? A. Hit the front and right fender and shoved my car against the bridge banisters.

"Q. I will ask you to state whether or not, as it appears now, that bridge was iron? A. Yes, sir.

"Q. Or steel, I believe they call it? A. Steel or iron one.

"Q. You say it threw your car against it? A. Yes, sir."

We also quote from the testimony of the plaintiff's witness, Morgan Green, as follows:

"Q. Mr. Green, did you see the collision between the two cars, one driven by Mrs. Ingram here, last—that was in January, two years ago? A. Yes, sir, I saw it.

"Q. Where did it happen, on what pike, and what particular place? A. On the Lebanon and Murfreesboro Pike, on the bridge over Stone's River out there near Walter Hill.

"Q. You were on the pike that day, yourself, traveling? A. Yes, sir.

"Q. Which way were you traveling? A. I was behind Mr. Foutch.

"Q. Behind Mr. Foutch? A. Behind Mr. Foutch, I was going towards Lebanon.

"Q. Traveling towards Lebanon? A. Yes, sir.

"Q. Did you see him as he approached and also as he entered upon the bridge across Stone's River? A. Yes, sir.

"Q. To which you have just referred? A. Yes, sir.

"Q. How far behind him were you? A. Well, I was pretty close; not over ten or fifteen yards, I wouldn't think.

"Q. How were you traveling, Mr. Green? A. I was in a car.

"Q. How was Mr. Foutch traveling, in what kind of car? A. He was in a Chevrolet roadster with a pick-up body on the rear end of it.

"Q. As he approached this south entrance to this bridge, what was his rate of speed, in your opinion? A. I think around thirty-five miles an hour.

"Q. Did you see him then as he entered upon the bridge? A. Yes, sir.

"Q. State whether or not he had to make the curve just before and as he entered upon the bridge? A. Yes, he did.

"Q. To his left going towards Lebanon? A. Yes.

"Q. Now, before he reached the bridge, did you see the car driven by Mrs. Ingram at any point? A. Yes, I saw it on the bridge.

"Q. It was on the bridge; where was the Ingram car, at what point, on this bridge, at the time that Foutch entered upon it, entered into the south approach? A. Well, I would think that it was approximately halfway across.

"Q. The Ingram car was coming this way? A. Yes.

"Q. Towards Murfreesboro? A. That is right.

"Q. Now, about what point, then, would you say—Did you see the two cars go together? A. I did.

"Q. Well, was it a head-on, or how was that; how did they come together? A. Well, it was almost a head-on; it had to be; it was a one-way bridge, but the Ingram car had pulled over to the right as

far as it could, and the other car did the same, and they almost hit at angles there.

"Q. Now, what do you say, did you notice, did the Foutch car slacken or slow up its speed at any time? A. Well, I said a while ago that it was going thirty-five miles an hour as it approached the bridge; he slowed up some before he turned on the bridge.

"Q. After he turned on, did he slow up that you could tell? A. It didn't seem to me that he slowed up any at all after he turned on the bridge before he hit this car.

"Q. As he made his turn and as he went on the bridge, he didn't slow up, did he? A. It didn't seem to me that he slowed up.

"Q. How fast was he going at that time, in your judgment? A. I would think, I don't know, but twenty or twenty-five—twenty miles an hour, I expect.

"Q. Could you notice or did you notice whether or not as he entered onto this bridge, or at any other time, that Mrs. Ingram speeded up or slowed down her car? A. Slowed down some.

"Q. And turned to her right? A. Turned to her right.

"Q. Now, as you approached this bridge, as Foutch approached it, and you behind him there at the distance. you have given, was there anything that obstructed your view, to keep you from seeing the Ingram car on that bridge and coming across? A. Not that I know of.

"Q. Was there anything to obstruct Foutch's view that you saw? He had the same view that you had? A. Not that I know of, outside of anything that might have been on the side of his car.

"Q. Well, what did you do as you drove up there to that bridge and the south approach of it?

"Mr. Green: I object to that, as to what he did wouldn't be competent, as he drove up to the bridge.

"The Court: I think that is competent; I overrule the objection. (To which ruling of the Court defendants except.)

"Mr. Cummings: Q. What did you do, Mr. Green? A. I stopped.

"Q. Stopped your car. State whether or not—what is the situation there on the south end of the bridge, that is, the end towards Murfreesboro, with reference to the width of the pike, how it is situated there; whether or not there is room to drive a car off of the hard surface to the right and bring it to a stop? A. There is room on the hard surface to pass just before you enter upon the bridge; there is room for two cars to pass without getting off of the hard surface part of the highway.

"Q. And you stopped? A. I drove up there and stopped.

"Q. Now, on what part of the bridge, or where was Mrs. Ingram, when you first saw her? A. She was on the North end of the bridge when I first saw her.

"Q. Coming onto the bridge where you were at that time? A. I hadn't reached the bridge yet; I was behind Mr. Foutch.

"Q. Could you see her all the time from the time she entered on the other end of the bridge until the time of the collision? A. Yes.

"Q. And did see her? A. I saw her before Mr. Foutch entered upon the bridge, saw her car.

"Q. Now, when you drove down there and brought your car to a stop did you get out or not? A. I got out after the collision.

"Q. Was there anything that you saw immediately in front of Mr. Foutch, over on his right; in other words, did you see anything that forced Mr. Foutch to enter into that bridge, in other words, to just keep on and enter into that bridge and run his car into this other car, or the two cars come together? A. No, sir.

"Mr. GREEN: If Your Honor please he can't ask him that; that is for the Jury to determine, whether—

"THE COURT: He can ask him if he saw anything that would operate to do that.

"Mr. FAULKNER: He asked him that a while ago.

"Mr. CUMMINGS: Q. Did you see anything? A. I did not.

"Q. Now, down at that approach, over on the right hand side, was there anything there in Mr. Foutch's way to keep him from driving up there and stopping and waiting for the Ingram car to come on across and clear the bridge? A. No, sir; there was no other car there and the highway was clear; there was nothing on the highway at the time."

It is averred in plaintiff's declaration that defendant Foutch recklessly, negligently, carelessly, and wantonly drove said truck at a rapid rate of speed and onto and against the plaintiff and her car, striking plaintiff's car most violently with said truck, demolishing plaintiff's car, and by the violence of the impact throwing plaintiff with terrific force against the steering wheel of the car; etc.

The first count of the plaintiff's declaration contains further averments, as follows:

"The proximate cause of the injury was the reckless driving of the Texas Company's agent James Roberts and the said W. L. Foutch at the time of the accident; the driving of said car or truck into said bridge and onto and against plaintiff and her car, when, by the rules of the road, said bridge being a one passage bridge, plaintiff having acquired the right-of-way on same; by forcing said truck at a violent and dangerous speed onto and in said bridge, when, the defendant, The Texas Company and James Roberts through their said agent, knew or should have known that the passage of the vehicles was impossible and collision was inevitable; the driving of said truck onto said bridge and onto and against plaintiff's car at so reckless a rate of speed, without looking to see if the bridge had been pre-

empted by another who controlled the right-of-way, or by driving said car onto said bridge and seeing that another, to-wit, plaintiff, had pre-empted said right-of-way, and, still, recklessly driving said truck at a rapid rate of speed onto said bridge and violently running said car into and over the approach of said bridge and finding that same had been pre-empted by plaintiff, with her car and knowing and appreciating that said bridge was a one-way bridge, by not applying the brakes and bringing said truck to a standstill before allowing it to violently crash into plaintiff's car; knowing said bridge to be a one-way bridge on said highway, admitting but of the passage of one vehicle at a time, by running said truck at so rapid a rate of speed to the approach and entry of said bridge as to cause it to collide with one using said bridge by right-of-way. And by driving said car when its brakes were in condition not to hold when applied said condition of said brakes known to said James Roberts and The Texas Company or by reasonable diligence could have been known to them.''

In the second count of the declaration it is averred that ''at the time the said W. L. Foutch so recklessly and wantonly ran his truck into the car of plaintiff and injured her, the said Foutch had wilfully put himself into a state of intoxication and was thus unlawfully driving said car upon the public highway in a state of intoxication in violation of law, and this state of intoxication directly conduced to the recklessness and carelessness of the said Foutch that resulted in the collision with plaintiff and her resultant injuries. Prior to the date of this injury and up to that date the said Foutch had frequently indulged in taking intoxicants, and this practice was open and notorious and was either known to his co-defendant employers or, by reasonable diligence could have been known to them, had they exercised any care or caution to have ascertained.''

We do not find any material evidence in the record supporting the averment in the second count of the declaration that defendant Foutch was intoxicated at the time of the collision; and the verdict, if sustained, must be referred to the first count.

The defendants have filed sixteen assignments of error in this court. The first assignment is that there is no evidence to support the verdict and judgment, and the second assignment is that the trial court erred in overruling defendants' motion for peremptory instructions made at the close of all the proof in the case.

The first and second assignments may be considered together, for, if there was sufficient evidence to require the submission of the case to the jury, there was some material evidence to support the verdict of the jury.

In their written ''argument,'' following their assignments of error and brief of law, counsel for the defendants say:

''It is not the purpose of this argument to discuss all of these as-

signments of error set out in the brief, but only to particularly discuss certain of these assignments of error. However, it is not intended to waive any of them.

"On examination of the record, it becomes manifest that the real issues pressed here all turn upon the question as to whether or not the plaintiff, Mrs. Kate Jones Ingram, was guilty of such contributory negligence at the time of the accident that would bar her recovery, and as to whether or not the driver of the Chevrolet Roadster at the time of the accident was the servant of The Texas Company, one of the defendants below and one of the plaintiffs-in-error here. This question is sharply presented in Assignments of Error No. 1 and No. 2, which were that there was no evidence to sustain the verdict and judgment, and that the Court erred in overruling motion asking that the Court instruct the jury to return a verdict in favor of the defendants. These two Assignments of Error are intimately connected with certain Assignments of Error in regard to the Trial Judge and his failure to charge certain special requests submitted by the defendants. The first and second Assignments of Error, being similar in nature, can, in the interest of time, be discussed together."

Although counsel for defendant disclaim a purpose to waive any of their assignments of error, we think it clearly inferable from their statement quoted above that they concede that there is material evidence in the record to support a finding that defendant Foutch was guilty of actionable negligence on the occasion under investigation. Whether such concession was intended or not, it is justified by the record; for, although, as before stated, there was a sharp conflict between the testimony of Mrs. Ingram and Morgan Green on the one hand and defendant Foutch on the other, we think it clear that the testimony on behalf of plaintiff is sufficient to support a finding that defendant Foutch was guilty of negligence as charged in the declaration, and that his negligence was a proximate cause of the collision in question and the resulting injuries to plaintiff.

We are also of the opinion that, in view of the testimony of Mrs. Ingram and Morgan Green hereinbefore pointed out, we cannot properly hold, as a matter of law, that Mrs. Ingram was guilty of negligence which was a proximate cause of the collision, and her resulting injuries. On the record, this was a question for the jury. Carey Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 36, 37, 164 S. W., 1183.

The remaining proposition advanced in support of the first and second assignments of error is that defendant Foutch, the driver of the Chevrolet truck at the time of its collision with plaintiff's car, was not the servant or agent of the Texas Company, and therefore the Texas Company is not liable for negligence of Foutch, if he was guilty of actionable negligence.

The question thus presented was submitted to the jury below, and

it is insisted for the Texas Company that this was error; that it appears from undisputed proof that defendant Foutch was the employee and servant of defendant Roberts, and not the Texas Company; that the Texas Company had no right to direct and control the movements of Foutch and/or the manner in which he should drive the truck in question, and that defendant Roberts was, in the sale and delivery of the products of the Texas Company, an independent contractor, and the Texas Company was not liable for his personal negligence nor for the negligence of his employees or servants.

On the other hand, it is insisted for plaintiff that defendant Roberts was the agent of the Texas Company, and that, as such agent, he employed defendant Foutch to assist in the business of the Texas Company; and it is further asserted in plaintiff's brief that defendant Foutch was, at the time of the collision, "engaged in the business of Roberts and the defendant Texas Company."

On August 22, 1929, the Texas Company and defendant Roberts entered into a written contract, which was in force at the time of the collision in question, and which reads as follows:

"Commission Agency Agreement

"Agreement, dated Atlanta, Ga., August 22nd, 1929, between the Texas Company, a Delaware corporation, having an office and place of business at Atlanta, Ga. (hereinafter called the 'Company'), and J. L. Roberts of Murfreesboro, Tenn. (hereinafter called the 'Agent'); witnesseth:

"First: The Company hereby appoints the Agent (and the Agent hereby accepts the appointment) as Agent for the Company at Murfreesboro, Tenn. The Agent's surety bond will be Twenty-five hundred Dollars ($2500.00).

"Second: The Agent's duties are hereby fixed by this agreement, the rules and practices of the Company, and by instructions issued by the Company from time to time.

"Third: The Agent shall:

"(1) Strictly observe and obey the Company's instructions and faithfully perform all duties connected with his agency.

"(2) Promptly, correctly and in strict accordance with Company's instructions, account for all Company moneys, goods, products, equipment, etc. in his possession, or coming into his custody, and pay the Company for any shortages which may develop at any time.

"(3) Sell the products of the Company for cash, or on credit properly authorized, and not exchange or agree to exchange the Company's products for property or merchandise for private use or account; personally pay the Company on demand (a) the sum due on any account opened by him without authority, and (b) any portion of any credit account which has been sold in excess of the credit

limit placed thereon by the Company. The Company shall not be under any obligation to make any attempt to collect such accounts nor to assign any part of such accounts to Agent until the Company shall have received full settlement thereof.

"(4) Neither (a) sell the Company's products, directly or indirectly, at less than authorized prices, nor (b) enter into any secret agreements, contracts or understandings with any customer or competitor for the purpose of reducing the price of the product or controlling business.

"(5) Not use the Company's goods or funds in any way for private purposes and not cash out of the Company's funds, personal checks for customers or other persons.

"(6) Not retain the amount of compensation due him from the Company from or as a charge against funds or any other property of the Company for which he is accountable.

"(7) Bear all expenses, except those mentioned in section '(3)' of clause 'Fourth,' incident to the proper operation of the station covered by this agreement, including, without limiting the foregoing, (a) cost of painting, lettering and general maintenance of the bulk station facilities, service station facilities, trucks, miscellaneous equipment, when owned by the Agent; and (b) cost of handling and installing gasoline and lubricating oil pump and tank equipment, whether or not said equipment be owned by the Company, which installation and handling by the Agent, if the Company owns the equipment, shall in no manner affect the Company's title.

"(8) At his expense, furnish trucks and other equipment when not supplied by the Company, in strict accordance with the Company's standards for such equipment.

"(9) At his expense, furnish all assistants and employees he may require for the proper and diligent operation of said station, and assume full direction and control over and responsibility for all such assistants and employees, and indemnify and save the Company harmless from loss arising out of or by virtue of all damage to property and/or injury to persons (whether or not such injury result in death) occasioned by the acts of the Agent, his assistants and/or employees.

"(10) Not permit any assistant or employee or other person who is not of mature age and judgment to fill, handle, ship or deliver any refined oil or gasoline at or from the Agent's plant, store room or vehicles.

"(11) Not assign this agreement without the prior written consent of the Company.

"Fourth: The Company shall:

"(1) Have the right at its option to withhold any commissions, moneys or anything of value in its possession belonging to or due

Agent, for the purpose of reimbursing itself for any amounts due hereunder from Agent at any time.

"(2) In event of termination of this agreement, have ninety days thereafter in which to remove its oils and other properties from the premises the Agent owns or controls, and have the right to use the Agent's storage for a period not exceeding three months upon payment of a rental of $50.00 per month for the period so used.

"(3) Pay (a) freight on products shipped, (b) license fees assessed for operation of main station and (c) taxes on Company's merchandise, stock and equipment.

"(4) Pay the Agent the following commission, based on less than carload sales and transfers:

"(a) 1 cent per gallon on sales of kerosene and/or gasoline when sale is made at the bulk station or where freight or drayage is prepaid or allowed and deducted from invoice.

"(b) 2½ cents per gallon on kerosene and 2¼ cents per gallon on gasoline when products sold are delivered by Agent's truck and invoiced at authorized schedule prices without deductions for freight or drayage.

"(c) 10 per cent of net revenue (exclusive of freight from station to destination) on sales of lubricating oil, grease, wax, asphalt products, roofing and shingles.

"(d) 1 cent per gallon on all gallonage products, and ——— cents per pound on all products sold by the pound, not otherwise specified.

"(e) ½ cent per gallon on all gallonage products, and 1/10 cent per pound on all products sold by the pound, transferred to other stations, districts, or departments of the Company.

"These commissions shall be subject to deductions herein mentioned and/or counterclaims by the Company, and, after deductions therefor have been made, the resulting sum shall be in full payment for all services rendered by Agent hereunder.

"Fifth: (1) The commission rates stipulated in Clause 'Fourth' hereof are applicable, but not limited to, all sales made within a radius of twenty-five miles of the bulk station. No commission shall be paid on carload transactions unless specifically agreed to in writing prior to the date such sales or transfers are made.

"(2) The Agent shall not be entitled to (a) commissions on any accounts or bills receivable transferred to Accounts Receivable 'B' or turned over to an agency or attorney for attention and/or collection, or (b) commissions on products returned to stock or products purchased from competitors for resale.

"All commissions will be computed on current sales and transfers. Deduction will be made from the Agent's current commission statement of commissions which have previously been allowed on those accounts or bills receivable transferred to Accounts Receivable 'B'

or turned over to an agency or attorney for attention and/or collection.

"(3) The Agent's commission account with the Company will be credited with commissions upon all current sales and transfers handled by or through the Agent, computed at the rates and in accordance with the provisions of this agreement, and payment thereof made as follows: At the close of each month and at termination of this agreement, the Company shall withhold from Agent's commission a sum equivalent to ten per cent of the then existing Accounts Receivable 'A' and shall pay Agent a sum equivalent to commission on all sales made by Agent and all transfers handled through Agent during the previous month plus the ten per cent of Accounts Receivable 'A' withheld at the close of the next preceding month, less deductions made in accordance with the provisions of this agreement. In event of termination of this agreement, the Agent shall not be entitled to receive thereafter, or the Company obligated to pay, (a) any of the amount withheld in accordance with this provision and/or (b) any commissions for sales, the proceeds of which have not been collected prior to date of termination.

"Sixth: The right of either party to require strict performance by the other hereunder shall not be affected by any previous waiver, forbearance or course of dealing.

"Seventh: (1) This agreement shall continue in full force and effect until terminated by either party on five days prior written notice.

"(2) Any and all agreements heretofore existing in reference to Agent's employment or compensation are hereby superseded and cancelled, and no modification of this agreement shall be binding unless signed by the parties hereto."

The business contemplated by the above quoted "Commission Agency Agreement" was conducted at and from a building in the town of Murfreesboro, owned by defendant Roberts and assessed for taxes in his name; but, by written contract with defendant Roberts, the Texas Company had the right to purchase said property, on specified terms, at its option, at any time during the term of, or within sixty days after the expiration or cancellation of, the aforesaid commission agency agreement, which option, so far as appears, was never exercised.

The state, county, and city ad valorem and privilege taxes on the business were paid by the Texas Company, and the licenses were issued in its name.

The little Chevrolet truck which collided with plaintiff's car, and two large tank trucks—all owned by defendant Roberts and registered in his name—were used in the business. The buildings, storage tanks, and trucks all bore the name of the Texas Company or its

trade-mark—the word "Texaco"—prominently displayed thereon, but the cost of same, and of all other expenses incident to the operation of the station (except freight on products shipped, license fees for operation of the main station, and taxes on the Texas Company's merchandise, stock, and equipment), were paid by defendant Roberts personally. The telephone was listed in the name of the Texas Company, but defendant Roberts paid the telephone bills..

At the time to which this action relates (January 24, 1930), defendant Roberts had four employees connected with his agency business at Murfreesboro, all of whom were employed and paid by him. These employees were Oliver, Baxter, Donohoe, and defendant Foutch. Oliver was the bookkeeper, and Baxter and Donohoe were the drivers of the two large tank trucks used in the distribution of petroleum products of the Texas Company among the customers of said Murfreesboro agency.

The nature and scope of the duties of defendant Foutch are not very clearly defined in the record. We quote from the testimony of defendant Roberts as follows:

"Q. What sort of an arrangement was had about how Mr. Foutch was to be paid, or who would pay him? A. I made arrangement with Foutch about paying him, and I paid him.

"Q. Paid him with your money or somebody else's money? A. Paid him with my money.

"Q. Sir? A. With mine.

"Q. Who told Foutch what to do, when to do it, gave him his instructions? A. I usually did.

"Q. Well, who else did? A. Well, nobody. At times Mr. Foutch went out on his own accord, if I happened not to be at the plant, if he knew of prospective customers or something like that; he had authority to go out then; but usually I directed all his activities.

"Q. Was there anybody else down there at the place of business that told him what to do or how to do it, or gave him any directions or orders at all? A. Well, at times; I have a nephew who is my bookkeeper down there, and at times when I left the plant I would leave it under his supervision, at times I would be out of town.

"Q. In other words, you would leave the bookkeeper in your place? A. Yes.

"Q. What did Mr. Foutch do about driving those vehicles you had down there—trucks, car? A. You mean whether he drove them or not?

"Q. Yes? A. Well, he drove this Chevrolet at times; he was seldom ever on the other trucks, you see, as I had two drivers to drive the tank trucks, and at times he takes my car.

"Q. Did you assign him any route or certain places to go? A. Well, not definitely. We would decide; and he usually told me 'I

am going on a certain route,' or 'I am going to see a certain customer,' and if I knew of anyone I wanted him to go to see, I would send him to go see the one that I wanted him to see. . . .

"Q. Did you know of your own knowledge what Mr. Foutch was doing out there in that Walter Hill section? A. I did not.

"Q. I believe you stated that you didn't tell him to go out there? A. No, I didn't.

"Q. Do you know of any connection at all that Mr. Foutch had with The Texas Company? A. No.

"Q. Did he receive any orders, any directions, from your Company? A. No.

"MR. FAULKNER: We except to that; in view of the contract, that is a matter for the jury under proper instructions of the Court.

"MR. ROBERTS: We are perfectly willing to let this contract govern in this connection.

"MR. FAULKNER: That is a conclusion of the witness.

"THE COURT: Still these facts and circumstances here shed light upon this subject, and I think they have the right to ask him the direct question.

"MR. FAULKNER: All right, Your Honor, we except to the Court's ruling because the answer of the witness is a conclusion and not a statement of fact.

"MR. ROBERTS: Q. I believe I asked you, when objection was made, if anybody gave orders or directions except you to Mr. Foutch? A. No, unless it was my assistant over there when I was out of town, as I have stated before.

"Q. Except as you have stated before; well, did anybody have the right to do that?

"MR. CUMMINGS: Well, except to that.

"MR. FAULKNER: For the same reason.

"THE COURT: Yes, that would be a question of law. . . .

"BY MR. FAULKNER (for the plaintiffs): Q. So under this contract that you had at the time of this accident, this injury, why, you placed this car, this Chevrolet of yours, in the business to deliver the products from that station over there, didn't you? A. Yes.

"Q. Mr. Foutch at that time was your duly constituted agent in the business? A. He worked for me, yes, sir.

"Q. He had a right to take that car on matters of the business? A. Yes.

"Q. That station was furnished in oils and gases by The Texas Company, alone, wasn't it? A. Yes.

"Q. That was the only product that was used there, wasn't it? A. Yes.

"Q. And the product that was sent there belonged to them, didn't it? A. Yes.

"Q. You sold it only on commission? A. Yes.

"Q. And you delivered it? A. Yes.

"Q. It was your duty to sell through these agents and by means of these vehicles—trucks, and for that sale of their products you got a commission? A. Yes.

"Q. When there was a sale of the product, all that belonged to you was the commission, wasn't it? A. Yes.

"Q. The debt incurred by the sale and the delivery of the product was a debt owing and due to The Texas Company, wasn't it, in every instance? A. Yes.

"Q. So that when it was being delivered it was The Texas Company's product that was being delivered? A. Yes."

We quote from the testimony of defendant Foutch, as follows:

"Q. Were you residing in Murfreesboro in January, 1930? A. Yes, sir.

"Q. By whom were you employed? A. By Mr. J. L. Roberts.

"Q. What were your duties; what were you doing there? A. Well, I was selling gas and oil.

"Q. Selling gas and oil; who for? A. Mr. J. L. Roberts.

"Q. Now, Mr. Foutch, on the day of this accident, were you driving the car of Mr. Roberts? A. Driving a little Chevrolet roadster with a slip-on body.

"Q. What kind of a car was it? A little Chevrolet roadster, with a slip-on body? A. Yes.

"Q. What time of the day was it? A. I think it was somewhere around one o'clock, or a little after, maybe.

"Q. Where had you started? A. Started to Walter Hill.

"Q. Where had you left from? A. Left from Murfreesboro.

. . .

"Q. Now, you have stated, Mr. Foutch, that you were employed by Mr. J. L. Roberts? A. Yes, sir.

"Q. Who paid you? A. Mr. Roberts.

"Q. Who gave you directions as to what work you were to do? A. Mr. Roberts.

"Q. How much did he pay you, Mr. Foutch? A. $125.00 a month.

"Q. Was that a regular salary? A. Yes, sir.

"Q. Did anyone else, other than Mr. Roberts, ever give you any directions as to what you were to do? A. Nothing; only sometimes he would leave the office and leave word there.

"Q. Leave word with whom? A. The bookkeeper, Brad Oliver.

"Q. Was he an employee of Mr. Roberts? A. Yes, sir.

"Q. Did you have any gas or oil or any kind of products in your truck at the time of the accident? A. No, sir.

"Q. It didn't contain anything? A. Nothing at all."

It is seen that there was evidence before the jury tending to show the manner in which the business in question was conducted, with particular reference to the exercise of authority over the employees of the business, but this testimony was material only to the extent that it tended to show who had the right to control and direct the movements of defendant Foutch at the time here under investigation; for "it is the reservation of the right of control of essential details, either express or implied, rather than the actual exercise of the right that distinguishes the relationship of responsible principal from that of the employer of an independent contractor." Gulf Refining Co. v. Huffman & Weakley, 155 Tenn., 580, 587, 297 S. W., 199, 201.

Defendant the Texas Company relies upon its contract with defendant Roberts, hereinbefore quoted, to relieve it of responsibility for the conduct of defendant Foutch. The provisions of the contract upon which the Texas Company places especial emphasis in this connection are (a) that the agent (defendant Roberts) shall, "at his expense, furnish trucks and other equipment, when not supplied by the Company," and (b) that the agent shall, "at his expense, furnish all assistants and employees he may require for the proper and diligent operation of said station, and assume full direction and control over and responsibility for all such assistants and employees."

On the other hand, the plaintiff, through her counsel, points out other provisions of said contract, viz.: (a) That the agent's duties are not fixed by the written agreement alone, but by the agreement and "the rules and practices of the Company, and by instructions issued by the Company from time to time;" (b) that the agent agrees that he will "strictly observe and obey the Company's instructions;" (c) that all trucks and other equipment furnished by the agent shall be "in strict accordance with the Company's standards for such equipment;" (d) that the agent shall "indemnify and save the Company harmless from loss arising out of or by virtue of all damage to property and/or injury to person (whether or not such injury result in death) occasioned by the Acts of the agent, his assistants and/or employees;" and (e) that the agent shall "not permit any assistant or employee or other person who is not of mature age and judgment to fill, handle, ship or deliver any refined oil or gasoline at or from the agent's plant, store rooms or vehicles."

After an examination of the record and numerous authorities cited by able counsel, this case, with respect to the liability of the Texas Company for negligence of defendant Foutch, has, in our opinion, narrowed down to the inquiry as to whether or not it is controlled by the ruling of our Supreme Court in the case of Gulf Refining Co. v. Huffman & Weakley, supra, wherein it was held, under circumstances closely resembling, in material respects, those involved in the instant

case, that the trial court did not err in submitting to the jury the question of whether the driver of the truck was the servant of the refining company.

The written contract involved in the case just cited contained no provision that the agent would, "at his expense, furnish all assistants and employees he may require for the proper and diligent operation of said station, and assume full direction and control over and responsibility for all such assistants and employees."

But we do not think that the presence of this provision in the written contract involved in the instant case affords a sufficient reason for distinguishing the two cases and taking from the jury the question of the relation of defendant Foutch to the Texas Company, when it is seen that, by other provisions of the same contract (all of which must be construed together), the Texas Company reserved to itself the right to prescribe rules and practices and issue instructions which should control the conduct of the business.

In the case of Texas Co. v. Brice, 26 F. (2d) 164, the United States Circuit Court of Appeals for the Sixth Circuit held otherwise; but that court expressly declined to follow the holding in Gulf Refining Company v. Huffman & Weakley, supra, saying that they were not under obligation to follow state decisions on such a question of general law.

As a matter of course, it is our duty to follow the rules laid down by our Supreme Court, and holding, as we do, that the present case falls within the ruling in the case of Gulf Refining Co. v. Huffman & Weakley, the first and second assignments of error are overruled.

The third, fourth, fifth, and sixth assignments of error are based upon the refusal of the trial court to give in charge to the jury four special requests for instructions tendered on behalf of defendant the Texas Company. These requests are set out in full in the assignments of error, but need not be repeated here, further than to say that they embrace affirmative instructions (a) that the Texas Company had no right to direct or control Foutch in the performance of the duties of his employment; (b) that Foutch was the servant of defendant Roberts, and his negligence (if he was guilty of negligence) would not be imputable to the Texas Company; and (c) that there is no evidence that the Chevrolet automobile in question was being used or operated by defendant Foutch at the time of the collision on the business of the Texas Company.

It is obvious that to have given these four requests, or any one of them, to the jury, would have been equivalent to a peremptory instruction to return a verdict in favor of the Texas Company, and this, as we have, in effect, already held, would have been error. The third, fourth, fifth, and sixth assignments of error are therefore overruled.

The seventh assignment is that the trial court erred in failing and

refusing to give in charge to the jury defendants' special request No. 6, as follows:

"I further charge you that if you should find from a preponderance of all the evidence that plaintiff Mrs. Ingram saw defendant Foutch approaching when a sufficient distance away, and realizing that a collision was imminent or likely, and could have stopped her car or so operated it after seeing Foutch and realizing the danger, but that she did not take steps or attempt to avoid the collision, then I charge you that she was guilty of negligence which, if the proximate cause of her injuries, would bar any recovery by her, and your verdict should be in favor of defendants."

On the subject of contributory negligence of the plaintiff, the court charged the jury as follows:

"Now, the contention of the defendants, further, is this: That, upon the occasion in question, that even if the defendant Foutch was guilty of negligence in thus operating his car and coming upon the bridge, yet, nevertheless, the plaintiff Mrs. Ingram was herself guilty of negligence in driving her car on and across the bridge and driving it on and upon the truck of defendant Foutch after it had come to a standstill; and that thus she was guilty of negligence in that she failed to use such care and caution as an ordinarily prudent person would use under like circumstances and that therefore she was guilty of what is known in law as contributory negligence, and that this negligence contributed directly to the infliction of these injuries upon her. Now, if you find this contention of the defendants to be true, then Mrs. Ingram would be barred and should not recover any damage on account of her contributory negligence."

In view of the instructions just quoted, it was not error to refuse defendants' special request No. 6, supra, and the seventh assignment of error is overruled.

Through the eighth and ninth assignments of error it is asserted that specified portions of the charge quoted in said assignments were erroneous. The criticisms leveled at the parts of the charge thus challenged may be seen from statements in the defendants' brief, which we here quote, as follows:

"The Eighth Assignment of Error complains of a portion of the Court's charge wherein the question was submitted to the jury as to whether Foutch, at the time of the collision was engaged in the business of The Texas Company, and whether said Foutch was an agent of The Texas Company and also of James L. Roberts, and whether at the time of the accident, the said Foutch was engaged in the line of his employment. In other words, in the course of the charge set out in this assignment the Court submitted to the jury the question as to whose agent Foutch was, when, under the undisputed facts in

the case including the commission agency agreement, he was only the servant of Roberts.

"The Ninth Assignment of Error relates to a longer portion of the Court's charge wherein the Court submitted to the jury for its consideration the written contract between the defendant The Texas Company and defendant Roberts, and told the jury that the contract 'neither fixes the defendant Foutch as the agent of The Texas Company, nor does it fix that he is not the agent of the defendant The Texas Company. That is the legal construction of this contract.' The Court also told the jury in the excerpt of its charge set out in the above assignment that 'it was for it (the jury) to take and consider the words in this paper (the contract), and what they meant as a matter of fact, not what they meant as law, but what they meant as a matter of fact,' and to consider the contract together with the other evidence shedding light upon the question of the relationship between The Texas Company and Foutch, and from that to determine whether Foutch was operating the Chevrolet Roadster 'in the line of business of the defendant The Texas Company as their agent or servant.' "

We have already held in this opinion, upon the authority of Gulf Refining Co. v. Huffman & Weakley, that it was not error to submit to the jury the question as to whether or not defendant Foutch was the servant or employee of the Texas Company and/or engaged in the business of the Texas Company at the time of the collision in question. The eighth assignment is therefore overruled.

We are also of the opinion that the instructions challenged by the ninth assignment are in harmony with the ruling in Gulf Refining Co. v. Huffman & Weakley, and that assignment is likewise overruled.

The tenth assignment is that "the Court erred in submitting the question to the jury as to the liability of The Texas Company to the prejudice of all the defendants as is shown by the excessiveness of the verdict."

In support of the assignment just quoted, it is pointed out that the Texas Company "was sued as a corporation and the evidence discloses its business to be rather voluminous," and, upon this predicate, counsel base an argument as follows:

"The effect of such knowledge on the jury is well known and undisputed. We do not hesitate to state our sincere opinion to be that the verdict would have been much less had the jury had only the rights of individuals to pass upon in this case. The mere size of the verdict is evidence of caprice or prejudice on the part of the jury. Defendants Foutch and Roberts were undoubtedly prejudiced by the erroneous submission of the question of their liability to the jury in connection with that of The Texas Company. Certainly, Foutch

and Roberts are entitled to another trial wherein their rights will not be so prejudiced and jeopardized."

The argument thus made is, we think, based upon mere speculation, and not upon any principle of law or rule of practice of which we are aware. The tenth assignment of error is overruled.

The eleventh assignment is that the court erred in charging the jury as follows:

"The principle of law is that a principal is responsible in law for the negligence of an agent committed in the line of business for which he is employed, or in the line of his agency business; but if a party be not the agent or not engaged in the line of business of his employment, then another party would not be responsible for his negligence as principal."

This, we think, is a sound statement of law, and was doubtless intended for the benefit of defendant the Texas Company, in view of its contention that Foutch was not its agent and not engaged in its business when the collision occurred. The eleventh assignment of error is overruled.

The twelfth assignment is that "the Court erred in overruling the objection made to the introduction in evidence of the option agreement between James L. Roberts and The Texas Company, because said option agreement was immaterial and irrelevant, to which action of the Court defendants excepted."

The "option agreement" to which this assignment refers was executed by defendant Roberts on December 7, 1929, and he thereby granted to the Texas Company, for a stipulated consideration, the right and option of purchase, at any time during the term of, or within sixty days after the expiration or cancellation of, the optioner's commission agency agreement with the Texas Company (or any renewal or other agreement in lieu thereof) at Murfreesboro, Tenn., (a) all the buildings, structures, and other improvements of any nature used in connection with the storage, handling, and/or selling of petroleum products, situated upon the land described in the option contract (which was the land owned by Roberts upon which he was then operating the aforesaid commission agency business); and (b) all the facilities and/or equipment, except automobiles and automobile trucks, wherever situated, owned by optioner and used by optioner and/or optioner's customers in the storage, handling, and/or selling of petroleum products.

We think said option agreement was competent evidence to go to the jury, along with the commission agency agreement and parol evidence, as tending to show the contractual relations existing between defendant Roberts and the Texas Company.

The thirteenth assignment of error is that the court erred (after stating in his charge the theory of the defendants) in charging the

jury as follows: "Now, if you find this contention of the defendants to be true by the preponderance or the weight of the evidence, or unless the weight or preponderance of the evidence shows that it is not true, then your verdict should be in favor of the defendants."

We do not understand, as argued for defendants, that the charge just quoted places the burden on defendants to support their theory by the preponderance of the evidence.

It is legally possible for a defendant to prove his theory by a preponderance of the evidence, and this frequently happens, in which case the defendant is entitled to a verdict in his favor; but (as the burden is on the plaintiff to make out his case by the preponderance of the evidence) the defendant is also entitled to a verdict in his favor unless the weight or preponderance of the evidence disproves his theory.

The instruction criticized by the thirteenth assignment of error merely stated each of the two contingencies upon which the defendants were entitled to a verdict in their favor, and that assignment is overruled.

By way of preface to the fourteenth assignment of error, it may be stated that a suit brought on behalf of Wade Hill Ingram, the infant son of Mrs. Kate Jones Ingram, against the same three defendants as in the suit at bar, seeking to recover damages for alleged injuries suffered in the same collision, was, by consent, tried together with this action of Mrs. Ingram, but the jury returned a verdict against Wade Hill Ingram (who sued by next friend), and judgment was entered dismissing his suit, and he made no motion for a new trial and did not appeal.

Through their fourteenth assignment, the defendants assert that the verdict in favor of the plaintiff Mrs. Ingram was "legally impossible" and was "arbitrary and capricious," in view of the verdict of the same jury, rendered at the same time, in favor of the defendants and against Wade Hill Ingram.

Assuming that the verdicts in the two cases are inconsistent, it does not follow, from that fact alone, that the verdict in favor of Mrs. Ingram, rather than the verdict against Wade Hill Ingram, was "legally impossible" and "arbitrary and capricious." The fourteenth assignment of error is overruled.

The fifteenth assignment is that the verdict is excessive; and the sixteenth assignment is that the verdict is so excessive as to indicate passion, prejudice, and caprice on the part of the jury.

The record is a large one, and there is much evidence bearing upon the character and extent of plaintiff's injuries.

Each side of this controversy has presented a summary of the evidence on this subject, and from these, taken together, we think a fair idea of the record facts pertaining to Mrs. Ingram's injuries,

with the respective contentions of the parties concerning same, may be gathered.

In support of their claim that the verdict is excessive, counsel for defendants sum up the evidence relating to Mrs. Ingram's injuries as follows:

"Mrs. Ingram testified that the collision threw her against the steering wheel of her car and threw her four year old child through the windshield. Mrs. Ingram, as stated, got into a car belonging to Mr. Jamison and went to Murfreesboro. Mr. Jamison came to the scene of the accident some minutes after it had occurred with a Mr. Jordan Dillon. Mrs. Ingram was standing on the ground talking when they drove up, and Mr. Dillon asked if anyone was hurt, and she replied, 'No, there wasn't anybody hurt.' Dillon stayed at the scene of the accident five or ten minutes and saw Mrs. Ingram get into Mr. Jamison's car unassisted, and saw her walking around, carrying her four year old boy in her arms.

"Mrs. Ingram went to her mother's home in Murfreesboro, returning to her own home in Wilson County that night.

"Mrs. Ingram was first examined on the afternoon of the accident by Dr. Kelton. She saw Dr. Kelton on two occasions. The next doctor who examined Mrs. Ingram was Dr. Finis E. Shannon, who did not see her until three or four weeks after the accident. She was also examined by Dr. M. B. Murphy (Murphree) on November 14, 1930, at his office. She was examined by Dr. Murphy (Murphree) on two or three occasions, on making one complete examination and then saw her once or twice afterward. Mrs. Ingram testified that she 'was better now than she had been.'

"Dr. Finis E. Shannon testified that he has known Mrs. Ingram since she was a child, and that he made a slight examination of her at her home after she was said to have been in an automobile accident. On this occasion, he testified that, he found she had a slightly fractured rib and appeared to be suffering a great deal. He strapped her with adhesive plaster, which is a proper treatment for fractured ribs. He does not remember where the fracture was, which rib was fractured, but testified that there was 'a little rough place over one rib.' Dr. Shannon also examined the lower part of Mrs. Ingram's back and found it tender, but stated that he knew Mrs. Ingram got better. In fact, Dr. Shannon said that she was a 'right smart' better than when he first saw her. Dr. Shannon would not say that Mrs. Ingram was permanently injured.

"Dr. Murphree first examined Mrs. Ingram at his office on November 14, 1930, and said that she complained of a good deal of pain in her chest and back. It was his opinion that she had 'what you might call a crack' in one of her ribs, but that there was no displacement. On March 16, 1931, an X-ray picture was taken and Dr.

Murphree gave as his opinion that from the X-ray she had a cracked rib. It was his opinion that the ninth rib on the right side was fractured. At the time of the examination it was impossible for him to say that the rib had been broken, and could not as a matter of fact say that she had a fractured rib, this having been testified to on cross-examination. He found nothing wrong with her spine, but did see some evidence of tenderness on feeling her back, especially when she moved her shoulders and spine, but gave as his opinion that she had nothing more than what is commonly known as a sprained back. Dr. Murphree would not say that any of her injuries were permanent, but further stated that no one could intelligently express such an opinion.

"Dr. W. T. Robinson, witness for defendants, examined Mrs. Ingram in September, 1931, and gave her a thorough and careful examination. He found no condition that could be connected with the accident, nor did his examination show any cause for her complaints of nervousness and pains in her chest. He saw no evidence of pain; and upon having her make various movements, saw no indication that she was actually suffering. After finding nothing wrong with her from this examination, she was sent to the hospital at Murfreesboro where X-ray pictures were taken. Dr. E. W. Rollins, who took the photographs, identified them. These photographs were read by Dr. J. C. Overall, a specialist in that line, and did not show any evidence of a fracture of the ribs or spine or any pathology.

"Some evidence was introduced that Mrs. Ingram performed work before the accident that she either did not or could not perform afterward. . . .

"The verdict is grossly excessive. Mrs. Ingram, at the most, suffered only a slight fracture of the rib, sprained back and possibly a few minor bruises. Not a witness testified that she was permanently disabled. The medical testimony introduced by the defense fails to show anything physically wrong with her, notwithstanding the fact that an X-ray photograph was made and a most thorough and searching examination at the office of Dr. Robinson. But, considering that there was a slight fracture of one rib and a sprained back, can it be said that $5,000 is only reasonable for such minor injuries? This is a period when money has a greater value than it did a few years ago owing to the sharp decline in commodity prices. Its buying power has increased and this verdict, in reality, is the equivalent of one considerably greater rendered but a few years ago. Then, too, a reading of the record discloses contributory negligence on the part of Mrs. Ingram which, if not the proximate cause then is surely the remote cause of her injuries. This being so, as a matter of law, defendants are entitled to a reduction in the amount of the verdict."

On behalf of plaintiff, her counsel say:

"On the question of the extent of the injury, it is virtually conceded that Mrs. Ingram, prior to this injury, was one of the strongest young women in her neighborhood? That she worked in the field and did man's work and was healthy and strong. That since this accident she has changed in appearance; looks sickly and weak and has not been able to do any work, scarcely, and is a nervous wreck. It does appear that some of the doctors who made examinations of Mrs. Ingram and gave her treatment were not at the trial, several others were there and made complete statements. Dr. Finis E. Shannon says that he examined her and found that she was suffering intense pain from a fractured rib. She was injured in the lower part of her back. Says she was suffering. Was not putting on, 'because she is not of that character.' He couldn't tell how many times he visited her and treated her. 'Several times, yes sir.'

"He came with them to have the X-rays taken. He says 'she continued to suffer; she got better; I know she got better; but she would have a spell of suffering after that; and still has them, I expect. I don't know.'

"The doctor says the last time he plastered her was in 1930 and then he taught her husband how to put on the plaster. Dr. Shannon knew this plaintiff from her birth to the time of the injury. She was of exceeding good health and strong. Since the accident 'exceedingly nervous, couldn't scarcely do anything at all.'

"The doctor says that her condition of strength and her condition of nervousness is such that no one can tell whether she will ever be normal again or not. 'A. No, nothing but time will do that.'

"Ten months after the accident plaintiff submitted to an examination by Dr. M. B. Murphree, of Murfreesboro. He found her 'very nervous as a result of this condition.' She was suffering pain in the right side of her chest and in her back in the lumbar region. He 'found tenderness on pressure, on bearing in the back and ribs.' 'Her rib is broken there.' Her condition showed to be the result of an accident. The doctor says 'the only condition of disease that would likely simulate a condition of that kind would be tuberculosis of the bone, familiarly known as Pott's Disease.' That she did not have Pott's Disease. The doctor says that her condition of suffering, pain, debility, weakness and intense nervousness, is due to this injury. He adds 'she must have suffered a great deal of pain from this injury.' When asked if the injury is a permanent one, he very intelligently answers that 'that question would be quite a problematic question.' He says nature is a great restorer. 'I would not say that it would not be permanent.' He says that the fact that she is still suffering from the injury, after the lapse of two years, 'would increase the probability that it would be permanent.' . . .

"No other physician witness ever calls in question the statement

of these two physicians. The record, as heretofore disclosed, shows by reputable neighbors that this young woman was strong and healthy up to the time she received this injury and that now she is sickly and weak and almost a nervous wreck. That is the proof in this record. That is the proof that the jury and the honorable trial judge had before them. By what semblance of sincerity can it be argued that a jury under these facts was influenced or prompted by ulterior motives in the rendition of a small judgment of $5000? Was the high and honorable and learned trial judge also influenced by passion and caprice in concurring with the jury?''

Throughout each of the foregoing quotations from the briefs of counsel there are numerous citations to the pages of the transcript, which we have omitted.

It is not within our province to weigh conflicting evidence with respect to the measure of damages. We must view the evidence touching that issue, as well as all other issues of fact in the case, in that aspect most favorable to the party successful before the jury.

Plaintiff suffered a fractured rib and a sprained back as a result of the collision in question, which injuries caused her much pain for a considerable time, but these primary injuries had healed at the time of the trial below, and the medical witnesses who examined plaintiff would not express the opinion that her injuries are permanent.

But there is material evidence that plaintiff was an unusually strong, healthy and able-bodied young woman, twenty-eight years of age, at the time she received the injuries for which is suing and that she was accustomed to doing a ''man's work'' in the fields on the farm tilled by her husband, but that since she was injured she has not been able to do outdoor work, and that much of the time during the period intervening between the collision and trial below she has been so weak and nervous that she has been unable to perform the ordinary duties of housekeeping, which she did before she was injured.

Guided by our understanding of the consensus of judicial opinion as to what will .constitute an excessive verdict, we have, after an examination of the record in the light of the briefs and arguments of counsel for the parties, respectively, reached the conclusion that the verdict of $5,000 in this case is excessive to the extent of $2,000. The fifteenth and sixteenth assignments of error are therefore sustained, and a remittitur of $2,000 is suggested. If the remittitur thus suggested is accepted by the plaintiff, the judgment will be affirmed to the extent of $3,000 and costs, and judgment will be entered here accordingly; otherwise the judgment of the circuit court will be reversed, the verdict of the jury will be set aside, and the

cause will be remanded to the circuit court of Rutherford county for a new trial.

If the remittitur is accepted by plaintiff, the costs of the appeal will be adjudged against the defendants the Texas Company, J. L. Roberts, and W. L. Foutch, and the surety on their appeal bond.

Crownover and DeWitt, JJ., concur.